Filed 5/14/15  Esparza v. PulteGroup CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SINOEH ESPARZA et al., | D063736 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. Nos. 37-2007-0055233-CU-BC-CTL, 37-2011-00098675-CU-BC-CTL) |
| PULTEGROUP, INC. et al., | |
| Defendants, Cross-complainants, and Appellants, | |
| MJB HEATING AND AIR CONDITIONING, INC., | |
| Defendant, Cross-defendant, and Appellant, | |
| MACORD CONSTRUCTION CORP., | |
| Defendant, Cross-defendant, and Respondent. | |
| SINOEH ESPARZA et al., | D064278 |
| Plaintiffs and Respondents, | |
| v. | |

PULTEGROUP, INC. et al.,

      Defendants, Cross-complainants, and
      Appellants,

MACORD CONSTRUCTION CORP.,

      Defendant, Cross-defendant, and
      Appellant.

      CONSOLIDATED APPEALS from judgments and orders of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Affirmed in part and reversed in part with directions.

      Kaloogian & Fuselier, Lowell Robert Fuselier and David T. Hayek for Plaintiffs, Respondents and Cross-appellants.

      Richard R. Sooy & Associates and John K. Schlichting for Appellants PulteGroup, Inc., and Centex Homes in No. D063736.

      Sooy & Schlichting, John K. Schlichting; McKenna Long & Aldridge, Charles A. Bird and Stefanie Warren for Appellants PulteGroup, Inc., and Centex Homes in No. D064278.

      Braden, Hinchcliffe & Hawley and Everett Hinchcliffe for Appellant and Respondent MJB Heating & Air Conditioning, Inc., a dissolved corporation.

      Everett L. Skillman; Bremer, Whyte, Brown & O'Meara, Vik Nagpal and Orchid Barzin for Respondent Arch Specialty Insurance Company, on behalf of Macord Construction Corporation, a suspended corporation.

2

Plaintiffs Sinoeh Esparza, Gayelea Esparza, Cailla Esparza, and Sinoeh Esparza, Jr., brought this construction defect and personal injury action against their homebuilder, Centex Homes (Centex), and several subcontractors, including MJB Heating and Air Conditioning, Inc. (MJB) and Macord Construction Corporation (Macord).[1] Centex cross-complained against MJB and Macord, among others.

Following a jury trial, as relevant to this appeal, the court entered judgments generally in favor of the Esparzas on their claims against Centex, and against Centex on its cross-claims against MJB and Macord. The court granted MJB's motion for attorney fees against Centex, and Macord's motion seeking the same relief was denied. The Esparzas, Centex, MJB, and Macord appeal on various grounds. As we will explain, we conclude three issues raised by the parties have merit: (1) the court erred by granting a partial new trial on the Esparzas' damages on the ground the jury's damage awards were inconsistent and irreconcilable, (2) the court erred by denying Macord's motion for attorney fees against Centex, and (3) the court erred in calculating MJB's attorney fees by making the same deduction twice. We conclude the remaining issues raised by the parties either have no merit or are moot in light of our disposition of other issues.

---

[1] The naming conventions in this opinion require some explanation: To avoid confusion, we will generally refer to the individual Esparzas by their first names only. Sinoeh and Gayelea are the parents of Cailla and Sinoeh, Jr. (hereafter Junior). While this litigation was pending, Centex merged into PulteGroup, Inc. (PulteGroup). Our references to Centex in this opinion include PulteGroup where appropriate. Because Macord is a suspended corporation, Arch Specialty Insurance Company (Arch) intervened on its behalf. (See *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc*. (2006) 136 Cal.App.4th 212, 217; see also Rev. & Tax. Code, § 19719, subds. (b) and (c).) Our references to Macord in this opinion include Arch where appropriate. Arch continues to represent Macord's interests in this appeal.

FACTUAL AND PROCEDURAL BACKGROUND

In February 2005, Sinoeh and Gayelea Esparza contracted with Centex to purchase a newly-constructed house on Shadetree Drive in San Marcos, California. The Shadetree house was part of a residential subdivision developed by Centex. Centex employed subcontractors to construct the houses in the subdivision. One subcontractor, MJB, performed heating, ventilation, and air conditioning work. Another subcontractor, Macord, installed drywall. During construction of the Shadetree home, two water intrusion events occurred. One event was caused by a job superintendent's failure to place chimney caps on the roof.

During escrow, Centex disclosed one instance of water intrusion at the Shadetree house. Centex gave the Esparzas the opportunity to cancel the purchase. The Esparzas were concerned about water intrusion, but a Centex representative assured them the Shadetree house was as good as new. Centex claimed to have restored and dried the home properly, although the restorer did work only on the first floor of the house. The Esparzas decided not to cancel the purchase.

At the final walkthrough before close of escrow, the Esparza observed numerous problems with the Shadetree house. Centex decided to cut the walkthrough short and do further repairs. The Esparzas wanted to delay closing, but a Centex representative told the Esparzas they would lose their deposit if closing did not occur as scheduled. The representative's statements did not reflect Centex policy, which would have allowed the Esparzas to delay closing without losing their deposit. Because of the representative's

4

statements, however, the Esparza decided to continue with the purchase. Had the Esparzas known they could cancel the purchase without losing their deposit, they would not have proceeded to closing.

Another final walkthrough occurred a week later. Numerous aspects of the house remained incomplete, but a Centex representative said everything would be fixed within two weeks. Escrow closed that day. The purchase price of the house was $737,780, not including $15,000 in incentives the Esparza received from Centex.

After the Esparzas occupied the house, they noticed additional items missing or in need of repair, including drywall, kitchen and bathroom plumbing, electrical systems, tile, cabinets, carpeting, fixtures, and appliances. Centex undertook efforts to fix these issues, but the repair work created additional problems. For example, work on drywall in the home produced substantial amounts of dust. Workers did not properly contain this dust, and it spread through the house. A large amount of dust accumulated in Cailla's room, in closets and on clothes, and on the Esparzas' beds.

In some places, including the Esparza's kitchen nook area, multiple rounds of repair work were required. Centex apologized for the extensive repair work. During one additional round of drywall repairs in the kitchen nook area, the workers placed protective plastic but it did not stay in place. Carpet and furniture were left unprotected.

Even after the bulk of the repair work was completed, some issues remained. Plumbing work continued for another year, and a heating vent and duct were discovered

to be disconnected some time later. Gayelea connected the vent herself, and a worker checking the Esparzas' heating and cooling system connected the duct.

Soon after they moved into the Shadetree house, the Esparzas began to experience numerous and varied health problems. Gayelea developed a sinus infection and was diagnosed with sinusitis, allergic rhinitis, and gastritis. Sinoeh also had sinus problems, including headaches, a runny nose, and sinus polyps. Gayelea suffered headaches and fatigue that impacted her daily activities. She put on substantial weight. The Esparzas' marriage suffered.

The Esparza children had new health problems as well. Four-year-old Cailla developed allergies, and six-year-old Junior was diagnosed with asthma and bronchitis. Junior suffered nosebleeds and headaches every night. Gayelea stayed up through the night to care for the children. Junior began to have hearing and speech issues, and he lost energy as well. He was not able to participate effectively in sports or preschool activities. Cailla had a middle ear infection, and both children had dark circles around their eyes.

The Esparzas left the house for a two-week vacation, and the children's symptoms improved during that time. When they returned home, the symptoms returned. A specialist in environmental medicine recommended they move out of the Shadetree house. When the Esparzas did so, their symptoms resolved completely. When they went back to the house, however, or encountered objects from the house, their symptoms returned.

6

The Esparzas filed this lawsuit, eventually naming Centex and subcontractors MJB and Macord, among others, as defendants. The Esparzas alleged causes of action for negligence, fraud, negligent misrepresentation, rescission, breach of warranty, breach of oral contract, breach of written contract, breach of express warranty, breach of implied warranties, and strict products liability. The Esparzas demanded compensatory damages, punitive damages, and rescission of the purchase agreement for the Shadetree house. Centex filed a cross-complaint against MJB and Macord, among others, for breach of express and implied warranties, negligence, contribution, and other claims.

The court held a month-long jury trial beginning in August 2012. Sinoeh and Gayelea Esparza testified regarding their purchase of the Shadetree house, the problems with the house, the work conducted by Centex and its subcontractors, and the effect of the work on the interior environment of the house. The Esparzas, their treating physicians, and several family members and friends testified about the health problems the Esparzas encountered after moving into the Shadetree house. Centex and subcontractor employees also testified.

The Esparzas presented testimony from several expert witnesses. One expert, Brian Daly, is an industrial hygienist and registered safety engineer. At trial, he described the safety hazards caused by the repair work in the Shadetree house, including drywall repair and sanding. Daly explained that drywall is composed of gypsum fibers that can cause irritation to the upper and lower respiratory tract. During construction or repair, the seams between drywall boards are sealed using joint compound, which

7

contains silica. Silica is also an irritant, and it can be released when dry joint compound is sanded. Workers using joint compound must use respirators. When work is conducted in an inhabited home, protections must be put in place to control the dispersion of dust and other particulate matter created by drywall work. Drywall work also produces respirable dust, which consists of small particles that can penetrate deep into lung tissue. Based on the evidence drywall work (including sanding) was done in multiple rooms in the Shadetree house while the Esparzas lived there, the work was done without proper containment, and construction dust was dispersed around the house, Daly testified that respirable dust was present in the Shadetree house while the Esparzas lived there.[2] He testified that the air quality in the house during that time was substandard.

Daly testified that the fact drywall was removed and replaced in certain areas of the Shadetree house created additional health hazards. When drywall is removed, materials inside the wall cavity will be disturbed and can become airborne. These materials include fiberglass, mineral wool, insect parts, and wood and paper fiber. These materials can remain airborne for several days and, even after they settle, can become airborne again when disturbed through cleaning or normal daily activities. Daly tested carpet in two areas of the Shadetree house and found evidence of mineral wool and cellulose. These substances are irritants that can affect the upper respiratory tract. In Daly's opinion, they were deposited in the carpet as a result of the construction activities

---

[2] Prior to trial, Daly went with Gayelea Esparza to visit the Shadetree house. While in the attic, Gayelea began to cough uncontrollably when her respirator came loose. Daly believed this episode was confirmation that irritants still existed in the house even after the Esparzas stopped living there.

in the house.  In addition, Daly conducted air sample tests for mold spores.  Daly's samples were consistent with the discovery, by a Centex expert, of mold growth in a wall cavity that was several feet across.

Daly also assessed whether the irritants and other substances in the Shadetree house could be remediated.  Daly testified that it was not possible to develop a protocol to remediate the house because he did not have enough information about the contaminants that exist there.

James Lineback, a medical doctor with specialties in pulmonology, anti-aging and internal medicine, testified for the Esparzas.  He has taught courses at several campuses of the University of California, including a course on pathophysiology and the mechanisms of disease.  Lineback examined the Esparzas; analyzed their medical records; and reviewed literature related to drywall, joint compound, and other substances in the Shadetree house.  Lineback explained the Esparzas were all suffering from different types of inflammation that affected the upper and lower airways of each family member.  Lineback testified that the Esparzas' conditions were caused by environmental exposures in their home.  Lineback did not testify whether mold had made any of the Esparzas sick.

In reopened testimony following a motion for nonsuit by Centex, Lineback identified the substances in the Shadetree house that had caused the Esparzas' conditions. Lineback testified that mineral wool, silica, fiberglass, dead insect bodies, and drywall dust had each caused the Esparzas' conditions to a reasonable degree of medical certainty.

9

Lineback also explained that each of these irritants would have an additive effect, and each would contribute to the irritating quality of the other. The court denied Centex's renewed motion for nonsuit after this testimony, but it limited the Esparzas to arguing that their personal injuries were the result of silica, mineral wool, and cellulose. The court's jury instructions reflected this limitation.[3]

The Esparzas also presented testimony from two real estate experts. An experienced real estate attorney and broker, Eugene Greenwald, testified that the Esparzas would have to disclose to any potential buyers (1) their medical conditions while living in the house, (2) the numerous contaminants present in the home (including mold), and (3) the aspects of the house that remained unfinished. In Greenwald's opinion, the Shadetree house was unmarketable, at any price, because of these required disclosures. The value of the house was zero. A licensed residential real estate appraiser, Reuven Silberman, concurred. Silberman testified that the value of the Shadetree house and property was "[e]ssentially zero." He also remarked that he suffered a headache after spending approximately 45 minutes in the Shadetree house. Twenty minutes after leaving the property, the headache was gone.

---

[3] The relevant instruction read as follows: "For purposes of their personal injuries, [t]he Esparzas are required to prove that one or more of the following specific [contaminants was] a substantial factor in causing their harm: [¶] Silica; [¶] Mineral Wool; and/or [¶] Cellulose Fibers." In addition, the court gave the following special instruction regarding mold: "You have heard evidence that mold was found at [the] Shadetree [house] sold by Centex Homes to [t]he Esparzas. [¶] You are to consider the presence of mold at [the] Shadetree [house] for the purpose of determining [t]he Esparzas' claim that they have suffered property damage. [¶] You are not to consider the presence of mold for other claims."

10

As damages, the Esparzas claimed the diminution in the value of the house (which they claimed was worthless at the time of trial), mortgage interest, lost wages and other income, medical expenses, emotional distress, pain and suffering, and various out-of-pocket expenses. A number of other lay and expert witnesses testified.

During trial, the court entertained several dispositive motions in addition to Centex's motions for nonsuit referenced above. As relevant to this appeal, the court granted Macord's motion for directed verdict on Centex's cross-claim for breach of contract. The court granted the motion because the Esparzas' breach of contract claim against Centex (arising from the incompleteness of the house) did not include any argument based on drywall taping or imperfections that could have been caused by Macord. Centex does not appear to have opposed the substance of the motion. The court invited Centex to draft an appropriate jury instruction memorializing the exclusion, and Centex agreed. The record does not reflect that such an instruction was given.

The court also granted MJB's motion for nonsuit on Centex's cross-complaint. MJB argued Centex had not offered any evidence that any of MJB's work, including the unconnected heating vent and duct, damaged Centex or the Esparzas. The Esparzas' counsel confirmed they would not be arguing the unconnected heating vent and duct caused them injury. However, the Esparzas' counsel referenced the unconnected vent in closing argument as support for the idea the house was not complete at the time of purchase.

Following jury instructions and closing argument, the jury deliberated. In its verdict, the jury found in favor of the Esparzas on their breach of written contract cause of action against Centex (awarding $1,323,309.86), their breach of oral contract cause of action against Centex (awarding $1,350), their negligent misrepresentation cause of action against Centex (awarding $1,323,309.86), their statutory property damage cause of action against Centex (awarding $32,000), and their negligence cause of action against all defendants. As to the last cause of action for negligence, the jury found Centex negligent but cleared the remaining defendants, including Macord. On this cause of action, the jury awarded each Esparza the following damages: (1) Sinoeh -- $529,323.95 (past economic damages) and $50,000.00 (past noneconomic damages); (2) Gayelea -- $529,323.95 (past economic damages) and $100,000.00 (past noneconomic damages); (3) Junior -- $132,330.98 (past economic damages) and $100,000.00 (past noneconomic damages); and (4) Cailla -- $132,330.98 (past economic damages) and $100,000.00 (past noneconomic damages).

The jury also found in favor of the Esparzas on their intentional misrepresentation cause of action. On that cause of action, the jury found the difference between the price paid by the Esparzas for the Shadetree house and the actual value of the house, as of the close of escrow, was $110,841.17. The jury further found the amount the Esparzas reasonably spent in reliance on the misrepresentations was $584,368.72. The jury did not find fraud, malice, or oppression by clear and convincing evidence. The jury found in favor of Centex on the Esparzas' cause of action for concealment.

12

Centex moved for a new trial on the Esparzas' causes of action. The court granted Centex's motion in part, based on an alleged inconsistency between the jury's damage awards for negligence, breach of contract, and negligent misrepresentation, on one hand, and its award for intentional misrepresentation, on the other. The court found these awards "inconsistent and irreconcilable" and granted Centex a new trial on damages as to these causes of action. The court gave the Esparzas the option of accepting a remittitur to prevent the new trial. Sinoeh accepted the remittitur, and Gayelea rejected it.

Centex also moved for a new trial on its cross-complaints against Macord and MJB. The court denied both motions. Macord and MJB moved for awards of attorney fees against Centex. The court granted Macord's motion and denied MJB's motion. The court believed Centex had sued Macord for express indemnity, based on a contract containing an attorney fees provision, and Centex had not pled a claim for express indemnity against MJB. Contractual attorney fees were therefore unavailable to MJB.

The court entered judgments on the parties' claims and cross-claims. The Esparzas, Centex, Macord, and MJB appeal on various grounds, as we will discuss. Although this matter has been docketed as two separate appeals, we ordered them consolidated for purposes of oral argument and decision.

DISCUSSION

I

*Centex's Appeals*

A

Centex first contends the evidence does not support the jury's verdict on the Esparzas' negligence cause of action. Centex claims the Esparzas did not provide sufficient evidence of causation. In Centex's view, the Esparzas' expert testimony was too generic and speculative to connect the contaminants in the Shadetree house to the Esparzas' medical conditions.

"The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case. [Citations.] That there is a distinction between a reasonable medical 'probability' and a medical 'possibility' needs little discussion. There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury." (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402-403.)

"Thus, proffering an expert opinion that there is some theoretical possibility the negligent act *could have been* a cause-in-fact of a particular injury is insufficient to

14

establish causation. [Citations.] Instead, the plaintiff must offer an expert opinion that contains a reasoned explanation illuminating why the facts have convinced the expert, and therefore should convince the jury, that it is *more probable than not* the negligent act was a cause-in-fact of the plaintiff's injury." (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1118 (*Jennings*).) Where, as here, plaintiffs claim injuries caused by exposure to certain substances, they "need to introduce evidence that to a degree of reasonable medical probability, their injuries had been caused by exposure to [the substances]." (*Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1385 (*Cottle*).)

We review the jury's verdict for substantial evidence. (*Filbin v. Fitzgerald* (2012) 211 Cal.App.4th 154, 168.) "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.) To be substantial, evidence must be " 'of ponderable legal significance, . . . reasonable in nature, credible, and of solid value.' " (*Id.* at p. 873 [italics omitted].)

15

We conclude the expert testimony here was sufficient to support the jury's verdict. Daly, the industrial hygienist and safety engineer, reviewed the evidence of work that occurred in the Shadetree house and concluded, based on that work, certain potentially irritating substances had been released into the home. Daly also performed tests that confirmed the presence of two of those irritants, mineral wool and cellulose. Lineback, a medical doctor, reviewed the Esparzas' history and analyzed literature regarding the irritants Daly identified as being in the house. After considering other causes of the Esparzas' conditions, Lineback concluded the irritants identified by Daly were each a cause of the Esparzas' conditions to a reasonable medical certainty. Among the evidence supporting Lineback's conclusion were that many of the Esparzas' conditions were consistent with exposure to the irritants and the Esparzas' conditions cleared up when they were no longer exposed to the house (and thus the irritants). This evidence was sufficient to support a finding that it was more probable than not the irritants in the house identified by Daly had in fact caused the Esparzas' conditions. (See *Jennings, supra*, 114 Cal.App.4th at p. 1118; *Cottle, supra*, 3 Cal.App.4th at p. 1385.)

Centex relies on allegedly similar cases involving toxic mold. (See *Dee v. PCS Property Management, Inc.* (2009) 174 Cal.App.4th 390; *Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298.) In these cases, plaintiffs relied on new and novel techniques in attempting to prove exposure to toxic mold. (*Dee,* at p. 405; *Geffcken,* at pp. 1309-1310.) The trial courts' decisions excluding such evidence under *People v. Kelly* (1976) 17 Cal.3d 24 were affirmed. After that evidence was excluded, plaintiffs in those cases

16

could not demonstrate exposure to toxic mold, and their expert testimony—which relied on that exposure—was inadmissible on the question of causation. (*Dee,* at p. 405 [plaintiff's experts "sought to testify that [plaintiff's] exposure to mycotoxins caused her symptoms and her susceptibility to cancer without any evidence that [plaintiff] was exposed to mycotoxins"]; *Geffcken,* at p. 1311 ["In view of the absence of any reliable evidence that [plaintiffs] had been exposed to mycotoxins at the properties in question, [their expert's] opinions were speculative and conjectural."].)

Here, unlike *Dee* or *Geffcken*, the evidence demonstrating the Esparzas' exposure to irritating substances was not the result of new or novel scientific techniques. This evidence included (1) the Esparzas' reports of unprotected drywall work performed in their house; (2) photographic evidence of dust and debris dispersion following that work; (3) Daly's analysis of the specific irritants that would be released by the work, based on the components of drywall and joint compound; and (4) Daly's confirmatory testing of carpet in the house after the Esparzas had moved out. Based on this evidence, a jury could reasonably find that the Esparzas were exposed to irritating substances. Lineback was entitled to rely on this evidence as well. Centex's attempts to undermine this evidence (e.g., by referring to testimony of dust exposure as "anecdotal" or attributing different meanings to Daly's carpet testing results) invite us to reweigh the evidence, which we may not do under the governing standard of review.

Considering the Esparzas' evidence of exposure to various irritating substances, Lineback was entitled to conclude whether these substances caused the Esparzas'

17

ailments.  Centex's contention that Lineback's opinions were speculative and without reasoned discussion is unpersuasive for reasons we have already explained.  Lineback did not rely on simple "sick building syndrome," as Centex contends.[4]  Rather, he assessed the Esparzas' conditions against specific substances to which the Esparzas were exposed using his medical training and accepted literature regarding their effects on the human body.  Centex has not shown this assessment fell outside generally accepted diagnostic methods or relied on new or novel scientific tools.  On this record, Centex's disagreements with Lineback's interpretation of the evidence or use of certain terms are, at most, fodder for opposing experts rather than foundational challenges.  They go to the weight of Lineback's opinion, an argument properly directed at the jury.  Where, as here, plaintiffs have presented evidence that substances to which they have been exposed "were in some degree a cause of [plaintiffs'] physical injuries to a degree of reasonable

[4]     "Sick building syndrome," as Centex uses the term, appears to refer to a theory of causation that relies purely on an individual's history of illness when exposed to a particular building *without* any identification of the particular substances causing the illness or the mechanism of causation.  The Esparzas appear to have begun trial relying on this theory, but the trial court determined it was inconsistent with California law regarding causation.  The Esparzas then refined their theory by identifying specific irritating substances as causes, as we have discussed.  As Centex's counsel recognized during his closing argument, the case was not about sick building syndrome in the end, but instead was the following: "Their theory is that three specific kinds of airborne contaminants were in some way released into the indoor air environment of their house that they at some point inhaled causing them to suffer some personal injuries."  Indeed, Centex admits on appeal that "[t]he Esparzas do not attempt to revive on appeal their failed sick-building-syndrome theory."  The fact that Daly and Lineback had reviewed literature from the Environmental Protection Agency and others regarding sick building syndrome does not mean their opinions, in the end, were based on it.  Centex's focus on sick building syndrome does not acknowledge the substantial evidence at trial connecting the Esparzas' medical conditions to specific irritants.

18

medical probability, then there [is] a factual question for the jury to resolve." (*Cottle, supra*, 3 Cal.App.4th at p. 1385.) Whether we would have resolved the question differently than the jury here is irrelevant.

On reply, Centex appears to reframe its argument in part as a challenge to the admissibility of Lineback's opinions under *People v. Kelly, supra*, 17 Cal.3d 24, which provides for de novo review of the question whether Lineback relied on new or novel scientific methods in reaching his opinions. (See *People v. Pizarro* (2003) 110 Cal.App.4th 530, 558-559.) However, even assuming Centex has not waived this argument (see *Tilton v. Reclamation Dist. No. 800* (2006) 142 Cal.App.4th 848, 864, fn. 12), our conclusion would be unchanged under that standard for the reasons we have already stated. Indeed, as this court explained in an different (though instructive) situation involving the admissibility of expert testimony, "[w]e view the standard of review issue in this case as one in which otherwise distinct standards of appellate review merge into a single approach." (*Jennings, supra*, 114 Cal.App.4th at p. 1119, fn. 9.)

We conclude the jury's verdict on the Esparzas' cause of action for negligence should be affirmed. Because of this conclusion, we need not address Centex's argument that the damages on the Esparzas' other causes of action are excessive because they include personal injury damages.

B

Centex next contends substantial evidence does not support the jury's verdict in favor of the Esparzas on their cause of action for statutory property damage under Civil

19

Code section 897. At trial, the Esparzas' claim rested on improper construction of the house and water soaked drywall. The jury awarded the Esparzas $32,000 on this cause of action. Damages under Civil Code section 897 may include the cost of repair, the cost of repairing any damage caused by the repair efforts, reasonable relocation and storage expenses, and reasonable investigative costs. (Civ. Code, § 944.)

Centex claims the Esparzas offered no evidence of damage and cites, as support, only a list of various categories of damages produced by the Esparzas. Centex's assertion is insufficient to carry its burden on appeal. "An appellate court ' "must *presume* that the record contains evidence to support every finding of fact . . . ." ' [Citations.] It is the appellant's burden . . . to identify and establish deficiencies in the evidence. [Citation.] This burden is a 'daunting' one." (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.) For example, Centex does not explain why the categories of damage do not include recoverable costs or why the jury would not be entitled to make its award based on other evidence of the cost of drywall repair introduced at trial. In reply, Centex again claims the Esparzas did not offer any proof of a cost to repair, but it provides no supporting discussion. Centex has not shown the evidence does not support the jury's award.

C

In a similarly cursory fashion, Centex claims its motion for new trial based on excessive damages should have been granted because the Esparzas produced evidence only of the diminution in value of the Shadetree house and not the cost of remediation. Centex offers little discussion of its argument in its opening and reply briefs. It provides

20

no citations to authority other than Code of Civil Procedure section 657, subdivisons (5) and (6), which list the applicable grounds for its new trial motion. Centex does not discuss the law governing property damage in general or as applied to the evidence adduced at trial. This is plainly inadequate.

" 'Appellate briefs must provide argument and legal authority for the positions taken. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' [Citation.] 'We are not bound to develop appellants' arguments for them.' " (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) Centex has waived its argument by providing neither reasoned argument nor citations to authority. (*Ibid.*) Moreover, it appears Centex's argument is contrary to settled law. (See *Herzog v. Grosso* (1953) 41 Cal.2d 219, 226 ["Plaintiffs established their damages by showing the depreciation in value. It was then incumbent upon *defendants* to come forward with proof that the cost of restoration would be less."], italics added; *Armitage v. Decker* (1990) 218 Cal.App.3d 887, 905.)

### D

Centex also challenges the court's order granting MJB's motion for nonsuit, as well as its subsequent order denying Centex's motion for new trial, on its cross-complaint against MJB. "A trial court must not grant a motion for nonsuit if the evidence presented by the plaintiff would support a jury verdict in the plaintiff's favor." (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838; see *Estate of Lances* (1932) 216 Cal. 397,

21

400.)  Where the trial court has granted a motion for nonsuit, " '[t]he judgment of the trial court cannot be sustained unless interpreting the evidence most favorably to the plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' "  (*Carson,* at p. 839.)

Centex focuses its argument on its cause of action for breach of express and implied warranties, arguing MJB granted such warranties in its subcontract with Centex. Centex contends, "*If* plaintiffs suffered harm from HVAC work, MJB would be the responsible subcontractor."  (Italics added.)  Centex does not explain whether the evidence showed that the Esparzas in fact suffered any harm from HVAC work.  Centex has not carried its burden on appeal.  The judgment of the trial court is presumed correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  Centex has the burden of affirmatively demonstrating error.  (*Ibid.*)  It has not done so.

Moreover, as MJB points out, there is no evidence MJB's HVAC work caused the Esparzas any harm.  The only alleged deficiencies in MJB's work were an unconnected duct and an unconnected vent.  Gayelea noticed the unconnected vent and connected it herself, and a repairman connected the duct for the Esparzas.  Centex has not cited any evidence the Esparzas incurred any additional cost for that connection or that they suffered any harm from MJB's work.  Absent that harm, Centex has not shown there was evidence presented at trial that could have supported a jury verdict in its favor.  (See *Estate of Lances, supra*, 216 Cal. at p. 400.)  The court did not err in granting nonsuit,

22

and Centex was therefore not entitled to a new trial. (See *Steele v. Werner* (1938) 28 Cal.App.2d 554, 556.)

E

Centex further contends the court erred in granting a directed verdict in favor of Macord on Centex's cross-claims for breach of express and implied warranties and indemnification. Macord performed the initial drywall work in the Shadetree house. Centex points out that the drywalled ceiling in the Esparzas' kitchen nook exhibited a "hump" that required several repairs. Centex argues "there was substantial evidence to support a finding that by doing substandard work in the kitchen nook, Macord breached its warranty and became liable for express indemnity because Centex's contract liability to the Esparzas in part arose out of or related to Macord's work."[5]

The order granting directed verdict must be reversed if "there is substantial evidence to support [Centex's] claim, *and* if the state of the law also supports that claim." (*Margolin v. Shemaria* (2000) 85 Cal.App.4th 891, 895.) Here, as Macord points out, Centex does not cite to any evidence supporting its contention that *Macord's* work was the cause of the "hump" in the kitchen nook, rather than some other cause (such as the two water intrusions suffered at the Shadetree house). Centex cites evidence the "hump" existed, and the kitchen nook drywall was "wavy," but this evidence does not tie these

---

5      Centex also claims that "if any negligence claim [by the Esparzas against Centex] survives, Centex cannot be liable unless Macord was negligent -- and therefore responsible at least in part." However, the jury expressly found that Macord was not negligent. Centex does not acknowledge this finding in its argument or explain why or how it should be reversed.

imperfections to Macord's work. Indeed, in Gayelea's testimony regarding the nook, she links the damage to the water intrusions that occurred in the house. And the hump itself appears to have arisen only after repair work had been done. Centex also cites evidence of imperfections in subsequent repair work on a crown molding, but again Centex does not explain how Macord was responsible. Gayelea testified that, prior to any repairs, the initial work on the crown molding was "beautiful."

Centex's construction expert, Timothy Prater, testified Macord would be responsible if the Esparzas proved "they suffered damages as a result of drywall repairs or damage associated with drywall," but the foundation of Prater's testimony is unclear. Later, Prater appeared to contradict his statement, explaining on cross-examination that two other contractors, in addition to Macord, performed drywall repair work.

Prater's bare conclusion that Macord would be responsible for damages "as a result of drywall repairs or damage associated with drywall" is not substantial evidence to support Centex's claim, especially considering Prater's later testimony. "Expert opinion testimony constitutes substantial evidence only if based on conclusions or assumptions supported by evidence in the record. Opinion testimony which is conjectural or speculative 'cannot rise to the dignity of substantial evidence.' " (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) " '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .' [Citation.] The ultimate

24

determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633; see *Margolin v. Shemaria, supra*, 85 Cal.App.4th at p. 895.)

The court did not err in ordering a directed verdict on Centex's contractual claims against Macord. Because of our conclusion, we need not consider Macord's alternate arguments in support of affirmance.

F

Centex raises several additional issues in its appeals. However, as we will explain, they are mooted or otherwise unnecessary for us to decide because of our disposition of other issues raised by other parties. We therefore need not further address them here.

II

*The Esparzas' Appeal*

A

The Esparzas contend the trial court erred in granting a conditional new trial on the issue of damages. The basis for the trial court's order was that the jury's damage awards on the Esparzas' causes of action for negligence, breach of contract, and negligent misrepresentation, on one hand, and its award for intentional misrepresentation, on the other, were "inconsistent and irreconcilable." The court explained, in the former awards, "the jury appears to have found the difference in value between what the [Esparzas] paid and the fair market of the property to be $738,941.14. In [the latter award], the jury found the difference in value to be $110,841.17. Since these verdicts are inconsistent and

25

irreconcilable, the Court grants a new trial on damages on [the damages awards for negligence, breach of contract, and negligent misrepresentation], unless [the Esparzas] agree to a remittitur reducing the damages by $628,099.97 ($738,941.14 - $110,841.17)." The court surmised the alleged inconsistencies resulted from juror confusion regarding the issue of rescission.[6]

" 'Inconsistent verdicts are " 'against the law' " ' and are grounds for a new trial. [Citations.]  'The inconsistent verdict rule is based upon the fundamental proposition that a factfinder may not make inconsistent determinations of fact based on the same evidence.  The rule finds parallel expression in the law relating to court findings: "Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error." ' [Citations.]  An inconsistent verdict may arise from an inconsistency between or among answers within a special verdict [citation] or irreconcilable findings."  (*City of San Diego v. D.R. Horton San Diego Holding Co.* (2005) 126 Cal.App.4th 668, 682 (*City of San Diego*).)

Although an order granting a new trial is generally reviewed for abuse of discretion, " ' "any determination underlying [the] order is scrutinized under the test appropriate to such determination." ' "  (*City of San Diego, supra*, 126 Cal.App.4th at

---

6    During trial, the jury asked two questions about rescission.  The court correctly responded that rescission was not an issue for them to decide.  Centex does not rely on this alleged confusion as support for the court's finding of inconsistency.  After reviewing the record, we conclude the juror notes do not show the damage awards are necessarily inconsistent.

p. 678.)  Because interpretation of a special verdict is a legal question, we review de novo the court's determination that the jury's findings were inconsistent.  (*Ibid.*)

Here, we do not see any inconsistency between the awards cited by the trial court in its new trial order.  The lower award for intentional misrepresentation cited by the trial court, $110,841.17, reflected only a portion of the damages for that cause of action.  As the Esparzas point out, that figure was awarded by the jury in response to a specific question on the special verdict form that limited the jury's determination of damages to the diminution in the value of the Shadetree house *at the time of close of escrow*.[7]  That question was followed by another question asking the jury to award further damages, on the same cause of action, for amounts the Esparzas reasonably expended in reliance on the misrepresentations.  The jury responded to this second question with an additional award of $584,368.72.

By contrast, the other awards cited by the trial court, for negligence, breach of contract, and negligent misrepresentation, were not limited to the time of close of escrow.  The questions posed to the jury on these causes of action simply asked for the Esparzas' damages as to each cause of action, without qualifications or limitations.[8]  The jury was

---

[7]    The question read as follows: "What is the difference between the price paid by [t]he Esparzas for the house and the actual value of the house they received as of the date of the close of escrow?"

[8]    The relevant questions were the following: "What are Sinoeh Esparza's and Gayelea Esparza's damages from this breach?" (breach of written contract); "What are Sinoeh and Gayelea Esparza's damages arising from the misrepresentation?" (negligent misrepresentation); and, "Without consideration of a reduction in the amount of damages for negligence by any [p]laintiff, if any, what do you find to be the total amount of

therefore free to award the Esparzas additional damages, in addition to the diminution of value of the Shadetree house at the time of close of escrow, for Centex's negligence, breach of contract, and negligent misrepresentation. (See Civ. Code, §§ 3300 [damages from breach of contract]; 3333 [damages from negligence]; 3343, subd. (a) [damages from negligent misrepresentation, i.e., fraud, in the sale of real property].) The jury's award of damages, in addition to diminution in value at the close of escrow, on the Esparzas' cause of action for negligent misrepresentation shows the jury believed those additional damages had been established.

Because damages for intentional misrepresentation and negligent misrepresentation are both governed by Civil Code section 3343, Centex claims "the only possible correct verdict for negligent misrepresentation was the $110,841.17 'difference between the price paid by the Esparzas for the house and the actual value of the house they received as of the close of escrow' found on the intentional misrepresentation cause of action [citations], not $1,323,309.86." Centex's argument ignores two important points.

First, Civil Code section 3343 is not limited to the difference in value at the time of close of escrow. (Civ. Code, § 3343, subd. (a)(1)-(4).) For example, that section allows recovery of "[a]mounts actually and reasonably expended in reliance upon the fraud." (*Id.*, § 3343, subd. (a)(1).) The jury was not limited to damages for the difference in value at the time of close of escrow on either cause of action. Here, because the

damages suffered by each of the plaintiffs as a result of the facts and circumstances in this case?" (negligence).

28

question posed to the jury on the Esparzas' negligent misrepresentation cause of action was not limited to the difference in value at the close of escrow (as was one of the questions regarding intentional misrepresentation), the jury was free to award damages in addition to that amount.

Second, the jury did not simply award the Esparzas $110,841.17 on their intentional misrepresentation cause of action, as Centex's argument implies. Instead, as we have explained, the verdict form for this cause of action asked two separate questions regarding damages. The first requested that the jury identify "the difference between the price paid by [t]he Esparzas for the house and the actual value of the house they received as of the date of the close of escrow?" In response to this question, the jury awarded $110,841.17. The second question asked the jury to identify any additional damages *for the same cause of action*. In response to that question, the jury awarded an additional $584,368.72. In total, therefore, the jury awarded the Esparzas $695,209.89 on their cause of action for intentional misrepresentation, not $110,841.17.

Centex also claims an additional inconsistency in the awards. Centex argues, "The jury awarded identical damages for negligent misrepresentation, negligence, and breach of contract. . . . The Esparzas offer no retrospective calculation by which the jury could have followed the damages instructions for the distinct causes of action and reached such large numbers, identical to the penny." However, despite Centex's unsupported statement that "[t]he superior court correctly found" this inconsistency, nothing in the court's order conditionally granting a new trial shows the order rested on this argument, or that the

29

court even considered it. Centex does not appear to have raised this argument in the trial court. It is therefore unsurprising the Esparzas did not address this potential inconsistency in their opening brief. In any event, Centex has offered no reasoned argument and cited no evidence explaining (1) why the jury could not have awarded identical damages for these three causes of action or (2) why the identical damages awards are sufficient to establish an inconsistent verdict. As a result, Centex's argument fails. (See *Cahill v. San Diego Gas & Electric Co., supra*, 194 Cal.App.4th at p. 956.)

Because the jury's verdict is not inconsistent, the trial court abused its discretion in granting a new trial on the ground that the verdict was "against the law." (See *City of San Diego, supra*, 126 Cal.App.4th at p. 678.) The court's order conditionally granting a new trial must therefore be reversed and the jury's verdict reinstated. This reversal applies to both Sinoeh and Gayelea, even though Sinoeh accepted the trial court's remittitur and therefore no new trial was actually ordered as to his claims. "Normally, when the plaintiff has consented to a remittitur he cannot thereafter appeal on any inseverable issue. [Citation.] However, when a plaintiff accepts a remittitur and the defendant appeals, the case is in a different posture and the plaintiff cannot be held to have waived his right to appeal." (*Collins v. Union Pacific Railroad Co.* (2012) 207 Cal.App.4th 867, 882.) Because Centex has appealed the judgment, Sinoeh had standing to challenge the court's order conditionally granting a new trial. Our reversal therefore applies to him as well.

Because of our conclusions, the following issues are moot: (1) the Esparzas' argument that the trial court erred in presenting them with the option of a remittitur in its new trial order; (2) Centex's argument that the new trial order should be affirmed even if remittitur were unavailable; and (3) Centex's further argument that the Esparzas should not have been allowed to make differing elections regarding remittitur. We therefore need not consider them. Additionally, because Centex has not prevailed on its challenges to the judgment in favor of the Esparzas, its challenge to the trial court's cost award fails as well.

B

The Esparzas further contend the court erred by not instructing the jury to disregard time pressures during its deliberations. Had that instruction been given, they argue, the jury would have found by clear and convincing evidence that Centex acted with fraud, malice, or oppression in connection with their intentional misrepresentation cause of action.

During jury deliberations, Juror No. 12 requested to speak to the court regarding the conduct of the presiding juror. During an unsworn, reported interview in chambers, with counsel present telephonically, Juror No. 12 explained that the presiding juror and several other jurors had expressed concerns about the length of deliberation and possible conflicts with upcoming plans. Juror No. 12 reported the presiding juror said if they vote "this way on this issue, this means that we're probably going to have to go back into court . . . ." Juror No. 12 responded they should not consider that fact in deciding any

31

issue; the presiding juror did not answer.  Juror No. 12 surmised that the presiding juror had substantial influence with the jury.  However, Juror No. 12 revealed the jury had voted "no" on the issue in question, and "I think it would have gone that way regardless . . . ."  The court remarked, "My reaction is, based on what she said, there's nothing to do.  You know, jurors comment on things.  They vote.  She doesn't think it affected the ultimate result.  It didn't affect her.  The presiding juror is kind of pushy, but I don't think that justifies anything at this point."  After a break, the Esparzas requested a jury instruction reminding the jury to "deliberate based on the evidence and the law and not on any personal desire to be done with the case."  The court declined to do so.

The next day, the court received a note from Juror No. 12.  The note read as follows: "Judge, I would like to make you aware that the time issues are still being brought up.  He is acknowledging that he understands that I don't like it.  Nevertheless he keeps bringing it up.  I am unsure if people are being influenced by it, but I don't believe it is. . . .  Once again I just feel [you] should be aware of the situation."  The Esparzas did not request any further instruction.  The jury deliberated for two more days, and the issue was not raised again.

As the Esparzas suggest, we review the court's decision not to provide the Esparzas' requested jury instruction for abuse of discretion.  (See *People v. Waidla* (2000) 22 Cal.4th 690, 745-746 ["An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury."].)  The Esparzas have not demonstrated any abuse

32

of discretion.  Juror No. 12's concerns, although undoubtedly in good faith, were little more than vague complaints that jurors were too conscious of time pressures.  The mere fact jurors were concerned about their schedules does not mean they were inclined to decide the case based on those schedules.  Juror No. 12 herself did not believe the presiding juror's conduct affected the jury's vote or her own vote.  Her later note confirms that belief.

The court had already instructed the jury to "decide this case based only on the evidence presented in this trial and the instructions of law that [the court] will provide" and not to "allow anything that happens outside this courtroom affect your decision."  The court had also instructed the jury to conduct their deliberations in such a manner to allow each juror "a fair chance to be heard" and to consider "the evidence with the other members of the jury."  The court properly advised the jury that it could not "base [its] decision on chance, such as a flip of a coin."

Considering these instructions and the facts as presented by Juror No. 12, the court was within its discretion to decide that no further instruction was necessary.  Indeed, such an instruction may well have interrupted the natural flow of deliberations and caused more disruption than it was intended to cure.

The Esparzas also have not shown prejudice as a result of the court's failure to instruct.  "A judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.'  (Cal. Const., art. VI,

33

§ 13.) When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) Here, the jurors had already been thoroughly instructed regarding the proper bases for their deliberations. Even Juror No. 12 did not believe the jury had been influenced by the presiding juror's reference to time issues. The Esparzas point to their strong evidence of fraud, but they do not address whether the requirements applicable to Centex, as a corporate employer, were satisfied. (See Civ. Code, § 3294, subd. (b).) Moreover, absent any evidence the jury was actually influenced by any improper matter, even very strong evidence supporting a punitive damage award would not be sufficient in and of itself to demonstrate a reasonable probability that a result more favorable to the Esparzas would have been reached had their requested instruction been given.

The Esparzas have demonstrated neither error nor prejudice as a result of the court's decision not to instruct the jury in response to Juror No. 12's concerns. Because of our conclusion, we need not address Centex's alternative argument that the Esparzas have waived any challenge to the judgment by not seeking a mistrial or by failing to adequately discuss error and prejudice in their opening brief.

III

*MJB's Appeal*

MJB contends the trial court erred by denying its motion for attorney fees against Centex. The contract between MJB and Centex provides that MJB will indemnify Centex against any "[c]laims," which the contract defines to include attorney fees incurred "in enforcing this indemnity provision." In the trial court, MJB contended it could recover its attorney fees for defending against Centex's cross-complaint under this provision and Civil Code section 1717. (See *Baldwin Builders v. Coast Plastering Corp.* (2005) 125 Cal.App.4th 1339, 1341.) The court denied MJB's request, reasoning that Centex had not pleaded an express indemnity cause of action against MJB in its cross-complaint and thus the attorney's fee provision of the contract was not invoked.

On appeal, MJB argues the court erred in interpreting Centex's cross-complaint. MJB notes Centex's declaratory relief cause of action against MJB incorporated its prior causes of action, including express indemnity. Centex therefore cross-claimed against MJB for express indemnity as well. Indeed, at trial, the parties appear to have treated Centex's cross-complaint as including express indemnity.

Centex agrees the trial court erred in interpreting its cross-complaint. Indeed, Centex's own appeal of the court's order granting nonsuit to MJB relies on a reading of its cross-complaint that includes a claim for express indemnity. (See Part I.D., *ante*.) Centex also agrees that MJB is entitled to its attorney fees if the court's order granting nonsuit is affirmed. We agree as well. We therefore reverse the court's order denying

35

MJB's motion for attorney fees and remand for a determination of the amount of fees to be awarded.

IV

*Macord's Appeal*

The trial court granted Macord's motion for contractual attorney fees and awarded $149,111. Macord contends the court erred by reducing its requested fees in two respects: (1) disallowing hours billed by Macord's second attorney at trial, and (2) twice deducting hours billed in connection with a cross-complaint filed by Macord. Macord was represented by two attorneys at trial, Vik Nagpal and Orchid Barzin. Both attorneys participated in trial proceedings by examining witnesses, arguing motions, and crafting jury instructions. As Macord's lead attorney, Nagpal presented opening and closing arguments. The Esparzas were represented at trial by two attorneys as well, although Centex and the other subcontractors only had one attorney each. Centex had a paralegal present as well.

In its motion for attorney fees, Macord requested, among other things, an award reflecting pretrial and trial hours billed by both Nagpal and Barzin. In a preliminary ruling, the court determined that Barzin's hours at trial would not be part of the award. The court stated that it "declines to award fees for the second chair at trial for the five and a half weeks of trial. None of the other subcontractors had two attorneys." The court also determined that Macord could not recover fees related to its own cross-complaint. After further briefing, the court entered a final award. In addition to the two deductions

36

described above, the court determined Macord could not recover fees prior to the date Arch intervened on its behalf.[9]  The court therefore deducted all hours billed prior to that date.  The court's final award of attorney fees totaled $149,111.

We review the amount awarded by the trial court for abuse of discretion.  (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)  " 'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong["] ' -- meaning that it abused its discretion."  (*Ibid.*) " ' "[T]he abuse of discretion standard measures whether, given the established evidence, the lower court's action 'falls within the permissible range of options set by the legal criteria.' [Citation.]" ' [Citation.]  We do not defer to the trial court's ruling when there is no evidence to support it."  (*Robbins v. Alibrandi* (2005) 127 Cal.App.4th 438, 452.)

Macord's arguments focus on the court's calculation of "the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. 'California courts have consistently held that a computation of time spent on a case and the reasonable value of that time is fundamental to a determination of an appropriate attorneys' fee award.' "  (*PLCM Group, Inc. v. Drexler, supra*, 22 Cal.4th at p. 1095.)

Macord has not shown the court abused its discretion by disallowing Barzin's hours as the second attorney representing Macord at trial.  By comparing Macord's representation to other subcontractors, the court found that Macord's use of two attorneys

---

9      The court also reduced hours billed for a second attorney to attend depositions. Macord does not challenge that reduction in its briefing on appeal.

37

at trial was inefficient and duplicative. "In referring to '*reasonable*' compensation, [the California Supreme Court] indicated that trial courts must carefully review attorney documentation of hours expended; 'padding' in the form of inefficient or duplicative efforts is not subject to compensation." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*).)

Macord argues that Barzin's work at trial was "critically important" and therefore should have been compensated. However, the question before the trial court was not whether Barzin's specific actions provided any value at trial, but whether it was reasonable for Macord to use Barzin, in addition to Nagpal, to perform these tasks. Given the representation of other subcontractors, the trial court decided it was not reasonable. Macord has not provided any reason for us to disagree with that conclusion. *Deane Gardenhome Assn. v. Denktas* (1993) 13 Cal.App.4th 1394, cited by Macord, has no application here. In *Deane*, the court rejected the argument that the reasonable value of *all* of the legal services rendered to a prevailing party was zero. (*Id.* at p. 1399.) The trial court here did not determine that the value of Macord's legal services was zero; it awarded Macord $149,111 for those services. Instead, the trial court determined that a *portion* of Macord's claimed fees was unreasonable. The court was within its discretion to do so. (See *Ketchum, supra*, 24 Cal.4th at p. 1132.)

Macord implicitly claims the trial court was required to award fees for both Barzin's and Nagpal's hours after allowing both attorneys to represent Macord at trial. The trial court has no obligation to, and indeed in most cases should not, police the

38

reasonableness of a party's expenditures on legal services during trial. If Macord wished to have a team of attorneys represent it at trial, it was free to do so. But the expense of such a team, beyond that required for reasonable representation, may not be compensated through a fee award. (See *Ketchum, supra*, 24 Cal.4th at p. 1132.)

However, we agree the court abused its discretion by twice deducting the same billed hours, once because the hours pertained to Macord's cross-complaint and once because the hours were billed prior to Arch's intervention on behalf of Macord. There is no evidence supporting such a double deduction, and Centex's opposing argument offers no justification for it. The trial court therefore abused its discretion. (*Robbins v. Alibrandi, supra*, 127 Cal.App.4th at p. 452.) Although Centex is correct that we must presume the trial court did not err, the trial court's order shows both deductions were to be applied. Even in the absence of a detailed accounting, Macord has adequately demonstrated error. The trial court's second deduction of $2,448 should be deleted, and Macord's award increased accordingly.[10]

Macord also requests an award of attorney fees for this appeal. Although the trial court awarded it attorney fees, Macord has not separately attempted to prove its entitlement to attorney fees on appeal. We will therefore deny Macord's request, without prejudice to its ability to seek fees on this appeal from the trial court. (See *Banning v. Newdow* (2004) 119 Cal.App.4th 438, 459.)

---

10    The $2,448 figure used by the trial court reflects a minor arithmetic error introduced by Macord. However, because that is the figure used by the trial court in the duplicative deduction, it is the figure that must be used to correct it.

DISPOSITION

The court's March 8, 2013, order conditionally granting Centex's motion for a new trial is reversed, and the August 13, 2013, amended judgment is vacated. The court's January 13, 2013, judgment after trial is reinstated, to the extent it was superseded by the amended judgment, and is affirmed in full. As between Centex and the Esparzas, the Esparzas shall recover costs on appeal.

The February 1, 2013, judgment is affirmed. The court's February 15, 2013, order denying MJB's motion for attorney fees is reversed. The court is directed to enter a new and different order establishing MJB's entitlement to an award of attorney fees. The court shall conduct further proceedings to determine the amount of such award. As between Centex and MJB, MJB shall recover costs on appeal.

The court's June 10, 2013, order granting Macord's motion for attorney fees is reversed in part. The court is directed to enter a modified order increasing its prior award by $2,448. As between Centex and Macord, the parties shall bear their own costs on appeal.


McDONALD, J.

WE CONCUR:


McCONNELL, P. J.


McINTYRE, J.